UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————————————X
L.H., on behalf of herself and her minor child E.H.,

                                        Plaintiff,           **COMPLAINT**

                    - against -                              No. 23-cv-10955

New York City Department Of Education,
Chancellor David Banks, in his Official Capacity,
The Board Of Education Of The City School District
of The City Of New York, and The City Of New York,

                                        Defendants.
————————————————————————————X

### PRELIMINARY STATEMENT

1.      This is an action brought by L.H. (also referred to as "Plaintiff" or "Parent"), on behalf of herself and her minor child E.H., alleging that Defendants, the New York City Department of Education ("DOE"), the Board of Education of the City School District of the City of New York ("BOE"), Chancellor David Banks, in his official capacity, and the City of New York (collectively "Defendants"), violated Plaintiff's and E.H.'s rights under the Individuals with Disabilities Education Improvement Act ("IDEA"), 20 U.S.C. § 1400, *et seq*., Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 ("Section 504"), 42 U.S.C. § 1983 ("Section 1983"), and New York law.

2.      In this action, Plaintiff seeks, *inter alia*, review of an August 18, 2023 administrative decision of the New York State Review Officer ("SRO") in SRO No. 23-050 concerning impartial hearing Case No. 188574 and reversal of the portions of that decision that are adverse to her, including, *inter alia*, reversal of the SRO's finding that Defendant DOE offered E.H. a free appropriate public education ("FAPE") under the IDEA for the 2019-2020 school year and the denial of declaratory and compensatory relief requested by Plaintiff.

1

3.    Further, the Defendants have failed to implement the aspects of the IHO and SRO decisions that have become final.

4.    Plaintiff also raises systemic IDEA claims and individual and systemic claims pursuant to Section 504 and Section 1983 which the Impartial Hearing Officer ("IHO") and SRO below declined to take jurisdiction of and address.

5.    The systemic claims include but are not limited to policies and practices of the Defendants that are of general applicability to students with disabilities in Defendant City of New York and that have injured Plaintiff and E.H.: (a) absent litigation, the DOE fails to ensure the availability of certain types of 1:1 instruction for students with disabilities; (b) absent litigation, the DOE fails to ensure the availability of individualized inclusion programs.

6.    During the pendency of this action, Plaintiff seeks enforcement of E.H.'s "stay-put" rights pursuant to the IDEA's pendency provision, 20 U.S.C. § 1415(j), retroactive back to cover the period from the date the first due process complaint ("DPC") was filed. ``

7.    Plaintiff also seeks attorney's fees and costs under the IDEA for the administrative proceedings below and E.H.'s pendency rights, and for this action.

**JURISDICTION AND VENUE**

8.    This Court has subject matter jurisdiction over this action under the IDEA, 20 U.S.C. § 1415(i)(2)(A), (i)(3), as an action raising a federal question under 28 U.S.C. § 1331, and under 28 U.S.C. § 1343(a)(4).

9.    The Court has supplemental jurisdiction to adjudicate state claims arising out of the same facts as the asserted federal claims.  28 U.S.C. § 1367.

10.    Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(1), as it is the judicial district in which Defendants are situated and/or reside.

**PARTIES**

11.     Plaintiff L.H. is the mother of E.H.

12.     They live in Far Rockaway, New York.

13.     E.H. is a student with a disability who is eligible for a FAPE under the IDEA.

14.     E.H. is classified by the DOE with a speech and language delay.

15.     E.H. is a qualified individual with a disability who is eligible for a FAPE under Section 504 and is protected from discrimination based upon his disability.

16.     L.H. and E.H. are identified by their initials throughout this Complaint to preserve the confidentiality of sensitive medical, educational, and disability-related information under the IDEA, 20 U.S.C. § 1417(c), and the Family Educational Rights and Privacy Act of 1974 (FERPA), 20 U.S.C. § 1232g(b).  Minor E.H. is identified by his initials in accordance with Federal Rule of Civil Procedure 5.2(a)(3).

17.     Defendant BOE is located at 52 Chambers Street, New York, New York, and is a school board that is organized under and exists pursuant to the New York Education Law. *See* N.Y. Educ. L. § 2950-b(1).

18.     Upon information and belief, for all purposes, Defendant BOE serves as the public employer of all persons appointed or assigned by it.

19.     Defendant BOE was and continues to be the official body charged with responsibility for developing policies with respect to the administration and operation of the public schools in the City of New York pursuant to New York Education Law § 2590-b.

20.     Defendant David Banks is the current Chancellor of the New York City School District ("Chancellor") and, as such, is entrusted with the specific powers and duties set forth in New York Education Law § 2590-h.

21.     Under the New York Education Law, Defendant Chancellor functions as chief

executive officer for the BOE. N.Y. Educ. L. § 2590-h.

22.     Upon information and belief, many powers previously held by the BOE devolved to the Chancellor, with the administrative operations assigned to a body denominated by the Mayor of Defendant City of New York ("Mayor") and Chancellor as the DOE. Because the Chancellor operates through the DOE, the Chancellor and DOE are referred to interchangeably.

23.     The Chancellor is selected by and serves at the pleasure of the Mayor. N.Y. Educ. L. § 2590-h.

24.     The DOE is a creation of the BOE pursuant to its bylaws and is considered by Defendant City of New York ("City") to be a City agency.

25.     Defendant City is a municipal entity created and authorized under the laws of the State of New York.

26.     Upon information and belief, Defendant City exercises fiscal, administrative, and operational control over the other Defendants.

27.     Defendant City is responsible for funding special education services and implementing the relief requested pursuant to this action and in IDEA due process proceedings generally.

28.     The BOE, DOE, and Chancellor (collectively "Educational Defendants") jointly and/or individually constitute the Local Educational Agency ("LEA") under the IDEA and New York State law.

29.     The Educational Defendants are responsible for providing a FAPE to all eligible students in New York City and for promulgating policies and procedures in accordance with the IDEA and Section 504.

30.     All Defendants jointly and/or individually are recipients of federal financial

4

assistance.

31.    When the "DOE" is referenced throughout, the term DOE refers individually to Defendant DOE, as well as collectively to the Educational Defendants.

**LEGAL FRAMEWORK**

**The IDEA**

32.    The IDEA is designed to "ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs." 20 U.S.C. § 1400(d)(1)(A).

33.    States receiving federal financial assistance under the IDEA must adhere to the Act's procedural and substantive requirements and ensure that all eligible students with disabilities are afforded a FAPE.  20 U.S.C. § 1412(a).

34.    To be entitled to a FAPE, a student must have one or more of thirteen disabling conditions and, by reason of the disability, require "special education" and "related services."  34 C.F.R. § 300.8(a)(1).

35.    A FAPE must meet each student's "unique needs and prepare them for further education, employment, and independent living."  20 U.S.C. § 1400(d)(1)(A).

36.    A FAPE must be provided in conformity with an IEP. *See* 20 U.S.C. §§ 1401(9)(D), 1414(d)(2)(A).

37.    Every student with the designated disability classifications is entitled to an IEP, and the LEA must provide an IEP which is individually tailored to each student, and which sets forth the student's special education program and services.  20 U.S.C. § 1414(d).

38.    The IDEA prescribes, in detail, the process for developing IEPs and their contents. 20 U.S.C. §§ 1414(d)(1), (d)(2); 34 C.F.R. §§ 300.320(a)-(b), 300.324; *see also* N.Y. Educ. L.

§ 4401, *et seq.*; 8 N.Y.C.R.R. § 200.4(d)(2).

39.    School districts must have an IEP in place for each student with a disability at the beginning of each school year and must review that IEP not less than annually.  20 U.S.C. §§ 1414(d)(2)(A), (d)(4)(A)(i).

40.    The participants in an IEP meeting must include a representative of the LEA who is, *inter alia*, "knowledgeable about the availability of resources" of the LEA. 20 U.S.C. § 1414(d)(1)(B)(iv)(III).  Within the DOE, this individual is referred to as the "district representative."

41.    Before an initial IEP can be developed, a student must be evaluated in accordance with detailed procedures outlined in federal and state law.  The IDEA mandates that school districts conduct a full and individualized initial evaluation of each student with a disability and reevaluate the student at least once every three years unless the parent and the school district agree otherwise. 20 U.S.C. §§ 1414(a)(1)(A), (a)(2)(B)(ii).

42.    Evaluations must be "sufficiently comprehensive to identify all of the child's special education and related services needs, whether or not commonly linked to the disability category in which the child has been classified."  34 C.F.R. § 300.304(c)(6).  School districts must assess students "in all areas related to the suspected disability, including, if appropriate, health, vision, hearing, social and emotional status, general intelligence, academic performance, communicative status, and motor abilities."  34 C.F.R. § 300.304(c)(4).

43.    The IDEA requires that in developing a student's IEP, the IEP team "shall consider" the "results of the initial evaluation or most recent evaluation of the child." 20 U.S.C. § 1414(d)(3)(A)(iii).

44.    The IDEA permits parents to seek an independent educational evaluation if they

disagree with the school district's evaluation.  20 U.S.C. § 1415(b)(1); 34 C.F.R. § 300.502.

45.    If a parent "obtains an independent educational evaluation at public expense or shares with the public agency an evaluation obtained at private expense, the results of the evaluation . . . [m]ust be considered by the public agency, if it meets agency criteria, in any decision made with respect to the provision of FAPE to the child" and "[m]ay be presented by any party as evidence" in the context of a hearing conducted under the IDEA's due process procedures.  34 C.F.R. § 300.502(c).

46.    "To meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances."  *Endrew F. v. Douglas County Sch. Dist. RE-1*, 580 U.S. 386, 399 (2017).

47.    An IEP must specify "the special education and related services and supplementary aids and services, based on peer-reviewed research to the extent practicable, to be provided to the child, or on behalf of the child, and a statement of the program modifications or supports for school personnel that will be provided for the child" in order for the child to "be involved in and make progress in the general education curriculum" and "participate in extracurricular and other nonacademic activities," "to be educated and participate with other children with disabilities and nondisabled children," and to "advance appropriately toward attaining the annual goals." 20 U.S.C. § 1414(d)(1)(A)(i)(IV).

48.    The IDEA defines "supplementary aids and services" as "aids, services, and other supports that are provided in regular education classes or other education-related settings to enable children with disabilities to be educated with nondisabled children to the maximum extent appropriate." 20 U.S.C. § 1401(33).

49.    "Each public agency must take steps, including the provision of supplementary aids

and services determined appropriate and necessary by the child's IEP Team, to provide nonacademic and extracurricular services and activities in the manner necessary to afford children with disabilities an equal opportunity for participation in those services and activities." 34 C.F.R. § 300.107(a). "In providing or arranging for the provision of nonacademic and extracurricular services and activities, including meals, recess periods, and the services and activities set forth in § 300.107, each public agency must ensure that each child with a disability participates with nondisabled children in the extracurricular services and activities to the maximum extent appropriate to the needs of that child. The public agency must ensure that each child with a disability has the supplementary aids and services determined by the child's IEP Team to be appropriate and necessary for the child to participate in nonacademic settings." § 300.117.

50.     The IEP must specify the frequency, location, and duration of the services and modifications to be provided. 20 U.S.C. § 1414(d)(1)(A)(i)(VII).

51.     In addition, special education and related services must be provided in the least restrictive environment that meets the child's educational needs.  20 U.S.C. § 1412(a)(5). Students with disabilities should be educated "with children who are not disabled" to "the maximum extent appropriate," and "special classes, separate schooling, or other removal of children with disabilities from the regular educational environment" must occur "only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." § 1412(a)(5)(A).

52.     "To help make certain that children with disabilities are held to high expectations and have meaningful access to a State's academic content standards," the United States Department of Education has clarified that a student's IEP "must be aligned with the State's academic content standards for the grade in which the child is enrolled," and when a child's

"present levels of academic performance are significantly below the grade in which the child is enrolled," IEP goals and services should be "sufficiently ambitious to help close the gap" between the child's skills and the applicable standards. U.S. Dep't of Educ., Office of Special Educ. and Rehabilitative Servs., *Dear Colleague Letter* 1, 5 (Nov. 16, 2015), *available at* https://sites.ed.gov/idea/files/idea/policy/speced/guid/idea/memosdcltrs/guidance-on-fape-11-17-2015.pdf.

53.    A "FAPE under the IDEA will necessarily be different for each child, as the IDEA expressly rejects any 'one size fits all' approach or restrictions that preclude the genuine individualization of a student's educational program." *F.L. v. Bd. of Educ. of Great Neck U.F.S.D.*, 274 F. Supp. 3d 94, 110 (E.D.N.Y. 2017), *aff'd*, 735 F. App'x 38 (2d Cir. 2018).

54.    For example, "[s]ome children with disabilities may not receive FAPE unless they receive necessary services during times when other children, both disabled and nondisabled, normally would not be served." U.S. Dep't of Educ., *Assistance to States for the Education of Children with Disabilities and Preschool Grants for Children with Disabilities; Final Rule*, 71 Fed. Reg. 46,540, 46,582 (Aug. 14, 2006). Extended school year services must be "available as necessary to provide FAPE," 34 C.F.R. § 300.106(a)(1), and can include services provided during the summer, as well as "before and after regular school hours," "depending on the circumstances of the individual child," 71 Fed. Reg. at 46,582. A public agency may not "[u]nilaterally limit the type, amount, or duration" of extended school year services. § 300.106(a)(3)(ii).

55.    If an IEP is predetermined due to a school district's "unofficial policy of not offering certain programs," the IEP is "procedurally flawed." *E.M. v. New York City Dep't of Educ.*, 213 F. Supp. 3d 607, 613 (S.D.N.Y. 2016).

**Due Process Procedures**

56.     The IDEA provides "procedural safeguards that enable parents and students to challenge the local educational agency's decisions."  *Murphy v. Arlington Cent. Sch. Dist.*, 297 F.3d 195, 197 (2d Cir. 2002) (citing 20 U.S.C. § 1415).

57.     Parents have the right to file a due process complaint "with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child."  20 U.S.C. § 1415(b)(6)(A).

58.     In New York, IDEA due process complaints must be litigated in a hearing conducted at the initial administrative level before an IHO.  N.Y. Educ. L. § 4404(1); 8 N.Y.C.R.R. § 200.5(i)-(j).

59.     New York State law places the burden of proof in impartial hearings on school districts, "including the burden of persuasion and burden of production," "except that a parent . . . seeking tuition reimbursement for a unilateral parental placement shall have the burden of persuasion and burden of production on the appropriateness of such placement."  N.Y. Educ. L. § 4404(1)(c).

60.     Under New York law, IHOs appointed after September 1, 2001, must have a "minimum of one year of practice and/or experience in the areas of education, special education, disability rights, civil rights or administrative law." 8 N.Y.C.R.R. § 200.1(x)(1). In addition, IHOs must "possess knowledge of, and the ability to understand, the provisions of Federal and State law and regulations" pertaining to the IDEA "and legal interpretations of such law and regulations by Federal and State courts." § 200.1(x)(4)(iv). IHOs "must be independent," "shall not be an officer, employee or agent of the school district or of the board of cooperative educational services of which such school district is a component, or an employee of the Education Department," and "shall not have a personal or professional interest which would conflict with his or her objectivity

10

in the hearing." § 200.1(x)(3).

### Pendency

61.     During the pendency of IDEA due process proceedings, "unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of the child . . . until all such proceedings have been completed."  20 U.S.C. § 1415(j).

62.     "[W]here the IDEA's stay-put provision is implicated, the provision triggers the applicability of an automatic injunction designed to maintain the child's educational status quo while the parties' IEP dispute is being resolved." *Ventura de Paulino v. New York City Dep't of Educ.*, 959 F.3d 519, 529 (2d Cir. 2020).

63.     "[T]he appropriate equitable relief for a stay-put violation is reimbursement or compensatory education (or both) for the full value of services that the educational agency was required to fund." *Doe v. E. Lyme Bd. of Educ.*, 790 F.3d 440, 445 (2d Cir. 2015).

### Appeals

64.     The decisions reached in due process hearings are subject to administrative appeals to the SRO, the second-tier administrative review under the IDEA.  34 C.F.R. § 300.514(b); N.Y. Educ. L. § 4404(2); 8 N.Y.C.R.R. § 200.5(k).

65.     An IHO decision that is not appealed is final and binding. *See* 34 C.F.R. § 300.514(a); 8 N.Y.C.C.R. § 200.5(j)(5)(v).

66.     Under New York law, the request for review to the SRO setting forth all of the issues on appeal is limited to a 10-page maximum, irrespective of the complexity and number of claims raised.  8 N.Y.C.R.R. § 279.8(b)-(c).

67.     Either party may seek judicial review of the SRO's decision in federal district court. 20 U.S.C. § 1415(i)(2)(A).

68.     An SRO decision that is against the weight of the evidence is not entitled to deference and may be reversed.  *R.E. v. New York City Dep't of Educ.*, 694 F.3d 167, 194 (2d Cir. 2012).  The SRO also is not entitled to deference on questions of law.  *Lillbask v. Connecticut Dep't of Educ.*, 397 F.3d 77, 82 (2d Cir. 2005).

69.     Where there has been a denial of FAPE, the IDEA grants courts broad discretion to "grant such relief as the court determines is appropriate."  20 U.S.C. § 1415(i)(2)(C)(iii).

70.     Courts may award "compensatory education" under the IDEA "to make up for denial of a free and appropriate public education."  *P. v. Newington Bd. of Educ.*, 546 F.3d 111, 123 (2d Cir. 2008).

71.     In addition, parents that prevail in IDEA due process proceedings may have the school district, here the Defendants, pay their reasonable attorney's fees. 20 U.S.C. § 1415(i)(3)(B)(i)(I).

**Section 504**

72.     Section 504 provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794(a); *see* 34 C.F.R. § 104.3(j); *see also* 29 C.F.R. § 1630.2(i)(1)(i).

73.     Section 504 requires the provision of a FAPE to qualified individuals. 34 C.F.R. § 104.33(a). The provision of a FAPE under the IDEA by the Educational Defendants is one way to satisfy Section 504 requirements.  34 C.F.R. § 104.33(b)(2).

74.     Under Section 504, an "appropriate education" is defined as "the provision of regular or special education and related aids and services" that "are designed to meet individual educational needs" of the individual with a disability "as adequately as the needs" of non-disabled individuals and which "are based upon adherence to procedures" that are set forth in the Section 504 regulations.  34 C.F.R. § 104.33(b)(1).

75.     Section 504 requires a reevaluation prior to a "significant change in placement" for students with disabilities who need special education or related services. 34 C.F.R. § 104.35(a).

76.     The U.S. Department of Education's Office for Civil Rights has advised that "transferring a student from one type of program to another or terminating or significantly reducing a related service" is considered a significant change in placement. U.S. Dep't of Educ., Office for Civil Rights, *Protecting Students with Disabilities: Frequently Asked Questions About Section 504 and the Education of Children with Disabilities* (last modified July 18, 2023), *available at* https://www2.ed.gov/about/offices/list/ocr/504faq.html.

77.     Courts may award equitable relief, including compensatory education, to redress a violation of Section 504.  *Mrs. C. v. Wheaton*, 916 F.2d 69, 75–76 (2d Cir. 1990).

**Procedural History of Administrative Proceedings and Related Court Action**

78.     On September 9, 2023, E.H. filed her original due process complaint ("DPC") for the 2019-2020 school year ("2019 DPC") by a non-lawyer advocate.

79.     The DOE assigned the 2019 DPC Impartial Hearing Office Case No. 188574 ("Case No. 188574").

80.     On February 28, 2020, the IHO assigned to Case No. 188574 issued an order on pendency directing the DOE to provide the following services during the period required for stay-put placement pursuant to 20 U.S.C. § 1415(j): On February 28, 2020, the IHO assigned to : (a)

13

five hours per week of 1:1 SEIT services; (b) SLT twice per week for 30 minutes on a 1:1 basis; and (c) OT twice per week for 30 minutes on a 1:1 basis.

81.    L.H. also asked the IHO to order the DOE to provide counseling that it had proposed on the 2019 IEP, but the IHO denied the addition of counseling as an "agreed-upon" service. As a result, E.H. did not receive any counseling, despite the fact that both the DOE and the Parent had agreed he needed that service.

82.    L.H., though counsel, filed an amended due process complaint in IH Case No. 188574on or about February 17, 2023.

83.    L.H. filed another DPC seeking independent educational evaluations ("IEE"), which was then consolidated with Case No. 188574.

84.    On February 12, 2023, the IHO in Case No. 188574 issued a Findings of Fact and Decision ("FOFD"), partially ruling for L.H. and E.H., denying some of their claims, and failing to rule on other claims.  Among other things, the IHO found that the DOE offered a FAPE to E.H. for the 2019-2020 school year but denied a FAPE to E.H. for the 2020-2021 school year.

85.    L.H. appealed the adverse rulings to the New York State Review Officer ("SRO") who issued a decision on August 18, 2023 (SRO No. 23-050). The DOE cross-appealed certain aspects of the FOFD but did not appeal the grant of funding for IEEs.

86.    The SRO declined to disturb any of the IHO's rulings and denied both cross-appeals.

87.    The SRO did not take jurisdiction of any claims under Section 504.

**E.H.'s Educational History**

88.    E.H. is 10 years old and is in the third grade.

89.    The DOE has classified E.H. with a "speech and language impairment.", although

none of the proposed IEPs doing so were implemented.

90.    E.H. has delays in the domains of academics, socialization, expressive and receptive language, executive functioning (particularly focusing and attending), and social-emotional functioning.

91.    He also struggles with spatial awareness and visual spatial skills.

92.    E.H. received Early Intervention services, including 1:1 teacher services, speech and language therapy ("SLT") and occupational therapy ("OT").

93.    In April 2016, when he was 2.5 years old, E.H. was evaluated by the DOE's Committee on Preschool Special Education (CPSE). The CPSE conducted a social history, an observation as well as psychological, educational, OT, and SLT evaluations.

94.    In 2017-2018 school year, E.H. attended a PreK program with the services of OT, SLT and special education itinerant teacher ("SEIT") services five hours per week.

95.    Because E.H. was going to be five years old before December 31, 2018, under the DOE's policies, E.H. was supposed to transition to a public school "kindergarten" in the 2018-2019 school year.

96.    In January 2018 the DOE conducted a reevaluation which included only a social history update, without any additional testing.

97.    In that social history, L.H. reported that E.H had delays in the areas of socialization, focusing, inferential reasoning, visual perception, appropriate play, expressive language and receptive language; she discussed an increase in services with the CPSE, but had not been granted any increase.

98.    As L.H. determined that E.H. was not ready to transition to a public-school kindergarten program, L.H. filed for an impartial hearing with a different attorney.  That Case was

designed Case No. 176061.

99.    In fall of 2018, L.H. enrolled E.H. in a private school, Yeshiva at South Shore, in a class of fourteen children, one teacher and one teaching assistant.

100.    At the time, due to Case No. 176061, E.H. also had pendency in five hours per week of 1:1 SEIT special education teacher services, SLT twice per week for 30 minutes, as well as OT twice per week for 30 minutes.

101.    On March 19, 2019, L.H. consented to a DOE's request for a reevaluation.

102.    On April 9, 2019, the impartial hearing officer ("IHO") in Case No. 176061 school year held that the DOE denied E.H. a FAPE, and ordered the DOE to continue providing the SEIT, SLT and OT for the remainder of the 2018-2019 SY.

103.    On May 3, 2019, the DOE's psychologist, Mariana Zambrano ("M.Z.") conducted a psychoeducational evaluation of E.H., pursuant to which she administered an IQ test and the WPPSI for preschool-age children.

104.    Under 34 C.F.R. § 300.305, the DOE was supposed to review with L.H. and the IEP team members the existing data and assessments concerning E.H. that existed and discuss what, if any, additional data and/or information should be part of any evaluation.

105.    However, at the hearing in Case No. 188574 at issue here, M.Z. testified that rather than follow the IDEA's mandate of discussing with the parent and the IEP team what additional data and assessments should be included as part of a reevaluation, she, alone, decided what assessments would be part of the reevaluation.  Further, at the hearing, M.Z. admitted that she did not consult with L.H. or any IEP team member before making any decisions about what type of assessments would be conducted as part of the reevaluation.

106.    An evaluation must assess a child in all areas related to his or her disability in order

to identify all of his special education needs, inform the classification, IEP goals, services and program. *See* 20 U.S.C. § 1414(c)(1), 20 U.S.C. § 1414(d), 34 C.F.R. §§ 300.303-305 and 8 N.Y.C.R.R. §§200.4(b). However, at the hearing in Case No. 188574, M.Z. testified at the hearing that her sole purposes of this assessment was to determine whether E.H.'s IQ was in the average range or "intellectually disabled."

107.    Moreover, at the hearing in Case No. 188574, M.Z. admitted that she did not issue L.H. a Prior Written Notice ("PWN") about her decision concerning the reevaluation (which was required pursuant to the IDEA, 20 U.S.C. §§ 1415(b)(3) and (c), 34 C.F.R. 300.503) since the DOE was not issuing PWNs for reevaluations at that time.

108.    M.Z.'s psychoeducational evaluation reported that E.H. exhibited average range cognitive skills, but below average reading skills. E.H. tested in the below average range in reading skills compared to same grade peers but was in fact a year older because he repeated pre-K; age equivalent scores were not reported.

109.    Despite repeating pre-K and being a year over-age for his grade, E.H. only knew nine of eleven letters presented, identified only one letter sound in isolation, identified two of three letter groups, and matched only one of five sight words to pictures. He had not yet mastered matching or providing rhyming words, matching beginning or ending sounds and blending orally presented words.

110.    M.Z. admitted at the hearing in Case No. 188574, that as part of her evaluation she did not explore the reason for E.H.'s difficulty with reading or compare E.H.'s evaluation results to those of his prior evaluations to assess progress.

111.    The CSE conducted a new social history with L.H. on May 6, 2019, after M.Z.'s testing. M.Z. did not review it before her assessment, as it was completed afterward. In the 2019

social history, L.H. described similar issues concerning E.H.'s challenges with focus, socialization, visual-spatial delays and academics that she had raised in the January 2018 social history.  Further, the 2019 Social History included information that L.H. had provided to the DOE explaining that E.H. was in a small class of fourteen children with two adults.

112.    As part of the 2019 reevaluation, the DOE only conducted M.Z.'s psychoeducational evaluation and a social history.  No reevaluation for speech and language, or occupational therapy was conducted, although it had been three years since the initial assessments in those areas when E.H. was 2.5 years old.

113.    The DOE scheduled an IEP meeting for May 22, 2019.

114.    For the 2019 meeting, the DOE apparently had a January 2019 report from E.H.'s SEIT, which indicated that E.H. had been held over due to his delays.

115.    The 2019 SEIT report describes that E.H. has social delays, difficulty focusing and following directions, as well as academic delays and states that he requires 1:1 support to function in his class. The report also indicates that the SEIT was using "role play" and "behavior charts." The report recommends continuation of the services.

116.    The DOE also obtained a progress report from the OT agency dated May 20, 2019, in which the OT provider conducted the PDMS-2. The OT report concluded that "delays persist in the areas of spatial awareness and visual spatial skills."  The OT report did not contain any goals and the DOE did not invite the OT provider to the IEP meeting.

117.    Finally, the DOE obtained a May 21, 2019, speech and language progress report, which notes that E.H. presents with receptive and expressive language difficulties.  That report noted that E.H. has difficulty recalling story details, recalling a story in sequence, describing and retelling events and following multistep directions.  Further, he uses limited vocabulary and has

misarticulations. His speech provider noted that E.H.'s communication deficits "negatively impact his ability to succeed in the classroom."

118.    In addition to conducting the psychoeducational evaluation, M.Z. served as the "district representative" at the May 2019 IEP meeting. For the 2019 IEP recommendations, that were to be implemented in September 2019, M.Z. recommended that E.H. enroll in an integrated co-teaching ("ICT") classroom for 30 periods per week for ELA, math, science and social studies, with the remainder of the program in the general education without any supports.

119.    At the hearing, M.Z. admitted that the IEP team was restricted in terms of what it could have considered: allegedly, due to the Least Restrictive Environment ("LRE") mandate, the only options the 2019 team considered (and could have considered) were "integrated co-teaching or general education with SETSS, or general education with related services."

120.    Although M.Z. claimed SETSS in an ICT was an option, she never considered it. T. 156. Further, she only considered general education with group SETSS and did not consider including any 1:1 SETSS, even though E.H. had 1:1 services at the time and had been held over. She claimed that "anything 1:1 is restrictive."

121.    M.Z. testified that the IEP team did not discuss or consider evidence-based reading programs.

122.    Further, M.Z. also testified that the DOE cannot offer 1:1 teaching services to address issues other than academic issues.

123.    At the school-age level, the DOE has only special education teacher support services ("SETSS") which largely focus on academic issues, while the 1:1 itinerant teacher services that E.H. had under pendency at the time of the meeting could address a range of issues, including executive functioning and social emotional issues.

124.    M.Z. also testified that class size for the ICT class is set by standard policy, and the IEP team cannot indicate the size of an ICT class on an IEP.  Moreover, the ICT class will vary by school, with a maximum size of 25 for kindergarten, with 40% students with IEPs and a 10:1 ratio. However, students are not assigned to schools based on class sizes of ICT.

125.    Although the ICT class is supposed to be limited to 40% of children with IEPs, the DOE will place additional children with IEPs into ICT classes, as long as their IEPs do not recommend ICT. Thus, an ICT class can have well over 40% of students with IEPs in the class.

126.    Further, M.Z. admitted that every ICT had a different program model, but that as per policy, the DOE would not specify any particular model or the IEP.

127.    Further, rather than write special education, supplementary aides, services, supports, accommodations and modifications on the section of the IEP that would have required the DOE to specific frequency duration and location of services as per 20 U.S.C. 1414(d), the DOE places those items on the IEP in a section called "management needs".  M.Z. claimed the failure to place those items on the recommended services section of the IEP was an "oversight."

128.    However, M.Z. – and every other DOE employee that testifies about this "management needs" section of an IEP testifies that the items listed are "discretionary," in that there was no specific ratio, location, frequency or duration of services in relation to those items and they could be implemented at the teacher's discretion at whatever frequency and/or duration the teacher concluded was appropriate.

129.    M.Z. admitted that the IEP contemplated that it would be up to the teachers' discretion and whatever assessments that they would conduct to decide how much group instruction, one-to-one instruction that E.H. would receive in the different subjects.

130.    M.Z.'s description of the use of this management needs section, which gives the

receiving school complete discretion over most of the IEP, rather than mandating duration, location, and frequency of services as required under the IDEA, is a system-wide policy and practice of the DOE.

131.    The DOE has repeated this practice every year it has created an IEP for E.H., as well as in the IEPs of all children who attend ICT classes.

132.    M.Z. also admitted that the 2019 IEP team did not consider assistive technology ("AT") T. 264. In order to have considered AT, the IEP team would have had to have had an AT evaluation.

133.    M.Z. admitted that the DOE did not offer tutoring on an IEP.

134.    The IEP also recommended continuation of SLT and OT twice per week for 30 minutes, as well as counseling once per week for 30 minutes on a 1:1 basis.

135.    The DOE did not establish that the IEP team considered the most recent evaluation, that the IEP was based on legally sufficient evaluations, that the goals were drafted in accordance with the IDEA or were adequate for E.H., that the program and services offered were appropriate and/or based on any specific report or evaluation.

136.    M.Z. testified that the goals and services were aligned to kindergarten skills and the IEP was designed for E.H. to attend a kindergarten class in September of 2019.

137.    However, due to E.H.'s age, under the DOE's policies, E.H. would have had to enroll in first grade if he had been registered at the proffered public school.  The DOE's policy in this regard is set forth in the Chancellor's Regulations and the DOE's policies.

138.    M.Z. claimed that she removed all 1:1 teaching and tried to replace E.H.'s five hours per week of push-in 1:1 special education teacher support with 30 minutes of pull-out counseling. However, there were no evaluations or reports that suggested this would be appropriate

for E.H. as he needed intensive 1:1 academic support, as well as executive functioning support; the five hours of 1:1 services he received in a small class was not even sufficient to address his academic and functional delays.

139.    Moreover, M.Z. was unable to explain why she did not recommend any related services or supports for non-academic periods.

140.    L.H. she did not think that a large classroom without 1:1 support was appropriate and due to his age, he would have had to enroll in first grade he enrolled in public school, as he would have turned six in October of 2019.

141.    At the time, E.H. was experiencing social issues, and he lacked confidence, and had not achieved reading, writing and math skills consistent with his age and grade level.  He was also having delays in articulation, struggled to follow directions and was very distracted particularly when he was engaged in a non-preferred activity.

142.    After the 2019 IEP meeting, the DOE offered E.H. a public-school placement at P.S. 197, the Ocean School.

143.    L.H. testified at the hearing (which was not rebutted) that despite not believing the program at P.S. 197 would be appropriate, she attempted to contact the school multiple times to schedule a visit, but no one every responded to her.

144.    Yet, after receiving the 2019 DPC, the DOE did not prove that it responded to this concern in the DPC either by submitting a response to the DPC providing L.H. with the information, contacting her or offering her any resolution pursuant to which information about the program was offered.

145.    L.H. kept E.H. in South Shore as of September 2019. He remained in kindergarten that year, rather than matriculating to first grade in public school, consistent with his age.

146.    The DOE did not implement E.H.'s stay-put placement under 20 U.S.C. 1415(j).

147.    In February 2020, the DOE asked L.H. to consent to yet another reevaluation, which she did on February 20, 2020. Again, rather than communicating with L.H. and the IEP team to review existing data and determine collectively what assessments were needed, the DOE unilaterally determined that the entire reevaluation would include only a social history update.

148.    Again, the DOE did not issue a PWN relative to the reevaluation.

149.    COVID-19 shut down the schools in mid-March 2020, while E.H. was still entitled to pendency pursuant to the 2020 Pendency Order in Case No. 188574.

150.    However, the DOE failed to offer or provide any SLT or SEIT services to E.H.

151.    During COVID, E.H. struggled with remote instruction that was being provided by Yeshiva of South Shore, and he was unable to focus or absorb lessons without L.H.'s 1:1 support, using prompts and rewards.  However, even with this strategy, E.H. could only attend remote instruction for 5-10 minutes at a time.

152.    In April 2020, the DOE held an IEP meeting, and then created an IEP (the "2020 IEP") as a result. The 2020 IEP recommended almost the identical program that had been recommended in the 2019 IEP that L.H. was challenging in the still-pending hearing at issue in this case:  part-time ICT, counseling 1x30 (1:1), and SLT (2x30).

153.    Additionally, however, in the 2020 IEP, the DOE proposed to remove E.H.'s OT, despite the fact that the DOE had not conducted an OT evaluation since 2020 and no OT participated in the 2020 IEP meeting.

154.    At the 2020 IEP meeting, L.H.  told the DOE that E.H. was not receiving any remote or in-person services and could not function with the existing remote instruction.  E.H.'s classroom teacher and SEIT also told the DOE representative at the 2020 IEP meeting that E.H. required 1:1

support.  At the time, despite being almost seven years old, L.H. had not yet mastered letter sounds or any sight words and could only write some of the letters of the alphabet and his name.  His math skills were very limited due to his reading delays.

155.    At the time of the 2020 IEP meeting, based on his age, L.H. should have been enrolling in second grade in the as of September 2020.  However, at the time, he was still in kindergarten.

156.    *Despite these delays,* the DOE did not offer any alternative services instead of or in addition to ICT, and at the 2020 meeting, never discussed or considered continuing any 1:1 teacher services for E.H.

**2020-2021 School Year**

157.    L.H. did not agree with the part-time ICT program without any individual support in the 2020 IEP, a fact she had already expressed in the pending hearing.

158.    L.H. did not accept the IEP and E.H. remained at Yeshiva of South Shore as of September 2020 for the 2020-2021 school year, during which time E.H. was supposed to receive his pendency services.

159.    L.H. had originally filed another hearing in September 2020, which was designated as Case No. 200200, but the IHO assigned advised that L.H. should withdraw Case No. 200200 without prejudice, and, instead, amend the 2019 DPC in Case No. 188574.

160.    L.H. filed an amended DPC on February 17, 2021, raising claims about the 2019-2020 and 2020-2021 SYs ("SYs at Issue") (collectively the "DPC").

161.    On October 23, 2020, L.H. – through counsel - submitted a request for E.H.'s special education records and a request for independent educational evaluations ("IEEs") pursuant to the IDEA.

162.    The DOE did not produce the requested records or respond to L.H.'s request for IEEs.

163.    When the DOE did not respond to the request for IEEs, L.H. filed another complaint seeking IEEs in March 2021, which the IHO then consolidated on April 9, 2021, with Case No. 188574.

164.    During the 2020-2021 school year, the DOE failed to implement most of L.H.'s pendency services.

165.    E.H. only received SLT for the last few months of the 2020-2021 school year.

166.    While the DOE issued belated Related Service Authorizations in November 2020, the DOE did not take any further steps to implement pendency or to locate or arrange for an SLT provider.

167.    E.H. only received some SLT services for half of 2021-2022, and they were discontinued again from September 2022 to December 2022.

168.    During the 2020-2021 school year, L.H. was receiving reports from E.H.'s school that he was experiencing social issues in the classroom, but as noted above, the DOE would not agree to provide counseling during pendency.

**The 2021-2022 School Year**

169.    E.H.'s case remained in pendency for the 2021-2022 SY, and he remained at South Shore.  In 2021-2022, E.H. was enrolled in second grade, although he should have been in third grade, based on his age.

170.    That year, L.H. proceeded to secure some of the compensatory services she had been seeking in the hearing, as she felt E.H. needed the immediate help.

171.    As of September of 2021, E.H. started to receive resource room at his private school, from 3:00 to 3:45 every day.  The cost of this resource room session was included in the $13,000 tuition.

172.    In December 2021, L.H. started E.H. with a Wilson-trained reading specialist for two hours per week. L.H. paid $75 per hour for the service.

173.    By December 2022, while E.H. continued to have academic delays, his reading had started to improve due to the additional supports L.H. had obtained.  With the compensatory services she had obtained, E.H. was able to read short stories more confidently and his comprehension has improved. E.H. is able to read and write more independently, up to 2-3 sentences. However, E.H. was still far below his appropriate age and grade level and could not yet read and/or understand the chapter books that the other students in his class were reading. With respect to writing, although E.H. made progress, he still required assistance; his SEIT reported to L.H. that he requires help in terms of "what he needs to write and sentence structure."

174.    E.H. still got distracted and easily frustrated in school.

175.    E.H. continued to require counseling to address his anxiety and social-emotional issues and explained that she wanted make-up counseling. Ex. AA, ¶48.

176.    E.H.'s SEIT from 2021-2022 testified that by the end of the 2021-2022 SY, she was continuing to work with E.H. to try to insert vowels into his words, and he was still inconsistent with that skill. In addition, by the end of the 2021-2022 SY, he continued struggle with math, as the common core required that he learn word problems and his reading delays continued to prevent him from being able to complete the math problems.

177.    In the hearing, L.H. testified that she wanted E.H. to make-up services for the SLT and SEIT that he did not receive in 2019-2020 and 2020-2021. She also testified that she wanted

E.H. to have tutoring to try to make up for the gap in his organizational and executive functioning skills.

178.   E.H. remained at South Shore for the 2022-2023 school year in the third grade and continued to attend there for the 2023-2024 school year.

**The Adverse Findings and Decisions of the FOFD and the SRO Decision Should be Reversed.**

179.   In the FOFD, the IHO found that the DOE offered a FAPE to E.H. for the 2019-2020 school year but denied a FAPE to E.H. for the 2020-2021 school year.

180.   As compensatory education, however, the IHO only ordered make-up services that E.H. was entitled to receive under pendency but did not receive, as well as 40 hours of counseling.

181.   The SRO upheld the IHO's findings about the 2019-2020 school year and refused to award additional compensatory education.

182.   The IHO and SROs made many factual findings and conclusions of law.

183.   The SRO and IHO ignored and failed to address the claims raised in DPCs;

184.   The IHO and SRO failed to hold the DOE to its burden of proof in the administrative proceeding and shifted the burden onto L.H.

185.   The SRO made findings of fact that were not based on evidence in the record of the hearing;

186.   The IHO and SRO's decision as to the 2019-2020 school year and the refusal to award additional compensatory education was not well-reasoned;

187.   The IHO and SRO failed to address the numerous procedural violations that individually and collectively resulted in a denial of FAPE.

188.    The IHO and SRO should have found that the DOE denied E.H. a FAPE in the 2019-2020 school year based on the fact that the DOE violated E.H.'s pendency placement and failed to implement his pendency program for the 2019-2020 school year.

189.    The IHO and SRO failed to apply the appropriate analysis for compensatory education for the 2020-2021 school year, as E.H. was entitled to additional compensatory education for that year.

190.    The IHO made and the SRO approved and made findings that were not based on the record;

191.    The SRO cited to inapplicable law and misapplied the law.

192.    The IHO and SRO made rulings that conflicted with the IDEA and Section 504.

193.    The SRO's rulings are inconsistent, and the SRO changes its position on cases, creating confusion and instability for parents;

194.    The SRO made several findings of law in the SRO decision that were not supported by either statute or cases.

**Deference is Not Due to the IHO and SRO**

195.    Deference is not due to the SRO with respect to Section 504, systemic IDEA claims, claims about Defendants' policies and procedures and claims brought under Section 1983, as the SRO does not have jurisdiction over those claims.

196.    Deference is not due to the IHO with respect systemic Section 504 and IDEA claims, claims about Defendants' policies and procedures and claims brought under Section 1983, as the IHO did not take jurisdiction over and/or rule upon those claims.

197.    Deference is not due to the IHO or SRO on any questions of law.

198.    The SRO has a conflict of interest in this case, as it raises question of systemic policies and practices that, if the Plaintiff prevailed, implicates the state with respect to liability.

199.    The SRO has an inherent, disqualifying conflict of interest that renders the SRO incapable of rendering an unbiased decision in cases raising systemic policy claims, as the SRO is a lawyer for the New York State Education Department ("NYSED") and an employee of NYSED.

**The SRO and IHO's Findings About Compensatory Education Were Contrary to The Record And The Applicable Law**

200.    The IHO and SRO wrongly denied additional compensatory education to E.H.

201.    Further, E.H. is entitled to additional compensatory education in the form of SEIT services for any missed services during the SYs at issue, as well as during pendency since the DPC was filed.

202.    E.H. was entitled to compensatory education for the deprivation of FAPE during the 2019-2020 school year.

203.    E.H. was entitled to compensatory education for the deprivation of FAPE during the 2020-2021 school year.

204.    It was an abuse of discretion, inconsistent with law and equity to deny E.H. additional compensatory during the time he was denied a FAPE.

205.    The compensatory award was insufficient to remedy the FAPE denial.

**Defendants Do Not Have Policies and Procedures Sufficient to Ensure Timely Implementation of Pendency Rights for Students.**

206.    By virtue of Plaintiff's initiation of this action appealing the SRO Decision, E.H.'s pendency rights as defined by the 2020 Pendency Order continue, and Defendants remain obligated to maintain E.H.'s pendency placement as set forth in that order.

207.    Defendants do not have policies and procedures in place to ensure that students' pendency rights are timely implemented such that the intended purpose of pendency is served.

208.    Defendants' failure to implement related services as pendency is part of two separate systemic issues.

209.    First, the Defendants fail to have policies and procedures in place to ensure timely implementation of student's pendency services in general.

210.    Defendants fail to implement and/or arrange for related services, instead focusing on forcing the parents to locate a private provider that the DOE can pay, either directly through the DOE's Impartial Hearing Implementation Unit or via a voucher system, called Related Service Authorizations (or RSAs) that the DOE issues to families when they cannot implement an IEP.

211.    Under the RSA voucher system parents must use a specific list of DOE contractors who accept vouchers.

212.    At times, DOE has issued RSAs to the Plaintiff for services owed under pendency, but those vouchers have never been issued in a timely basis.

213.    Further, because the rates for the RSAs are too low and because the Defendants' payment procedures are too delayed, many providers do not accept the RSAs.

214.    Plaintiff parents are entitled to reimbursement of their out-of-pocket expenses relating to J.D.'s education as damages for discrimination, as well as under the IDEA's general equitable provisions.

215.    Specifically, however, Defendants do not have an effective system to implement related services for children when the Defendants and/or DOE is responsible for doing so.

216.    Defendants' focus when implementing stay-put placements is on paying for private services that the parents locate, rather than taking ownership of and either providing and/or arranging for services.

217.    Once a parent locates a private provider, Defendants turn around and play "gotcha" and argue that the parent has now assumed the responsibility of paying for the provider and arranging for services, or they try to fight the appropriateness of the provider at the hearing.

218.    Historically, when the DOE was unable to implement pendency, the DOE would not contest a parent's right to seek compensatory services for their children even if the parent was forced – as here – to locate or use a private provider due to the DOE's inability to staff a case and/or shortages of providers.

219.    Over the past two years, the DOE has silently changed their policies and practices and now take the position that if the DOE is unable to implement pendency, but the parent agrees to an alternative implementation (i.e., to have the DOE directly pay a private provider or an RSA), it then becomes the parent's duty from that moment on to implement her child's pendency. Further, the DOE then argues the parent has to prove the appropriateness of the provider (even if the impartial hearing implementation unit has already approved the provider for funding for pendency).  In addition, the DOE argues that if a parent accepts a private provider at any point, the child is no longer eligible for compensatory education even though the reason that the parent has a private provider is because the DOE was unable to implement in the first instance.

220.    This policy violates the IDEA, and subjects children who are forced to use private providers due to the DOE's failure to offer FAPE in the first instance to discrimination.

221.   The DOE has implemented these policies and practices without notice to parents or the advocates and lawyers that represent them and fail to provide Prior Written Notice to families that they will be taking on a duty going forward and forfeiting any right to compensatory education.

222.   Since 2019, the DOE has failed to implement E.H.'s pendency even though L.H. joined a federal lawsuit to try to facilitate implementation, *M.W. v. New York City Department of Education*, 19-cv-0779.

**Predetermination and Systemic Policies and Practices**

223.   Upon information and belief, Defendants have applied illegal blanket policies and practices with respect to E.H.'s IEPs and placements.

224.   Defendants' policies and practices illegally predetermine and limit educational programming and service delivery options for E.H. and for students with IEPs generally in Defendant City, as well as implementation of due process rights to L.H.

225.   These policies and practices violate the IDEA and Section 504.

226.   E.H. has been subject to these policies and practices for multiple school years.

**The DOE Systemically Failed to Issue PWNs in Queens**

227.   The DOE failed to issue Prior Written Notices ("PWN") required under the IDEA during each specific time such PWN was required.

228.   As of 2018-2019 up through 2023-2024, there have been numerous times that a PWN was required but was not provided to L.H., including times pertaining to the E.H.'s reevaluations, when services were stopped under pendency, and/or when the DOE proposed to make changes to E.H.'s IEP, evaluations, placement and/or a FAPE.

229.   At the hearing, the DOE's staff testified under oath that PWNs were not issued at certain critical times, because the DOE did not – as a general policy – issue PWNs to parents at

those times, despite being required to do so under the IDEA.

230.    In fact, during the years at issue, the DOE has been issuing PWNs only after an IEP is issued to a parent.

231.    Moreover, the PWNs that the DOE did use during the relevant school years were boilerplate and did not contain the required information that a PWN is supposed to require, including an individualized explanation of the actions that the DOE took or refused to take.  Even during the years that were not yet exhausted, the DOE continued this illegal policy and practice of failing to comply with the PWN mandate of the IDEA, both in terms of failing to issue PWNs and then issuing only boilerplate, non-individualized PWNs.

**The DOE Fails to Consider or Offer Individualized Inclusion**

232.    The DOE fails to individualize inclusion programs for children like E.H. who are entitled to education in the least restrictive environment.

233.    The DOE only has two models of inclusion: an ICT class which has a set number of students at the kindergarten and elementary school level, at which point the class can have approximately 30 children.

234.    The IEP team is prevented from capping and/or recommending a smaller inclusion class.

235.    Further, the DOE only offers a service called "special education teacher support services" or "SETSS" to school-age children.

236.    According to how the DOE's district representatives, psychologist and IEP team members implement SETSS, SETSS is only to be used to address a child's academic delays.  A SETSS teacher cannot address issues like organization, behavior, socialization, activities of daily living, focusing and/or communication.

237.    Further, SETSS is generally recommended in a group and, as set forth here, the DOE's position is if a child requires more than three to four hours of SETSS, the child is more properly educated in a wholly segregated, self-contained special education class.

238.    In general, an IEP team cannot recommend a 1:1 special education teacher to push-into an ICT class, although a small number of children may receive group SETSS pulled out of such a class.

239.    Upon information and belief, the DOE also fails to ensure the availability of academic instruction, remediation, and tutoring provided on a 1:1 basis as an available option on the continuum of special education services that can be recommended for students with disabilities, both during and outside of the school day.

240.    The only special education teacher academic support service that the DOE has on its continuum which can be provided outside of the classroom is SETSS.

241.    Upon information and belief, in practice SETSS is overwhelmingly offered to DOE public school students only as a group service, and the DOE fails to ensure that its IEP teams have the requisite training, knowledge, and authority to offer SETSS as a 1:1 service, both during and outside of regular school hours, when required to appropriately address a student's individual special education needs.

242.    Furthermore, the DOE takes the position that students like E.H. who require more than five hours per week of SETSS should be moved to a segregated special class setting rather than remain in an integrated class while receiving the necessary amount of SETSS either during or outside of regular school hours.

243.    The General Counsel of the DOE recently issued a public letter dated November 1, 2023, which stated that in contrast to situations in which SETSS are provided on an individual

basis to students attending private schools and due process complaints involving "service hours for one child," "[i]n NYC public schools SETSS providers work with groups of children." The letter further stated that SETSS is recommended for less than 10% of the population of New York City public school students with IEPs, and "SETSS recommendations for those students receiving a public education are rarely for more than 4-5 hours a week, as needs more intensive than that would likely require more intensive interventions, such as a special class."

244.    The admissions in the DOE General Counsel's November 1, 2023 letter violate the core principles of the IDEA and Section 504 that (a) education of children with disabilities must be individually tailored to a student's individual needs and not limited by policy or administrative procedure or availability of services, and (b) students with disabilities must be educated in the least restrictive environment and should not be removed from the regular class setting when their special education needs can be met through the use of supplementary aids and services.

245.    Here, E.H. faced the same issue every single year since he has entered the school-age system, including the 2021-2022, 2022-2023 and 2023-2024 school year which the parent has not yet exhausted.  It is impossible for the DOE's IEP team to recommend an appropriate program because there are only limited options for that IEP team, none of which are appropriate for E.H.

246.    E.H. did not need to be relegated to a self-contained, segregated special education class, but he is also unable to manage a large, ICT class without any 1:1 support.

**The DOE Fails to Afford Reasonable Accommodations to Children with IEPs Who Need to Repeat a Grade or Continue 1:1 Teacher Services that are Not Limited to Academic Support**

247.    New York City has a draconian rule, that is: all children who turn five on or before December 31st in any given year must be enrolled in kindergarten.

248.    The overwhelming majority of states and districts do not require children to attend kindergarten if they turn five on or before the end of August.

249.    New York City also requires all children who turn six on or before December 31st in any given year must be enrolled in first grade.

250.    E.H.'s birthday is in October.

251.    E.H., like so many other children with disabilities, was not ready to participate in structured academic work consistent with his chronological age under the DOE policy.

252.    Further, the DOE offers different services to children who are receiving services through the preschool IEP than they offer to school-age children, even though the IDEA does not differentiate between preschool and school-age children in that way.

253.    The only way for a parent to try to keep the 1:1 teaching services that are available to a preschool child is not file for due process, as the DOE, as a matter of policy, restricts 1:1 special education teacher services to certain ratios and functionality at the school-age level.

254.    At the preschool level 1:1 teachers can work on a wide range of issues; they are limited to certain academic skills once a child enters kindergarten. The services are also limited in terms of how they can be recommended and are generally in group, as set forth herein.

255.    Further, the only way for a child with a disability to repeat prekindergarten and/or kindergarten is to file for due process.

256.    Further, when a parent files for due process and holds their child over, the DOE refuses to accommodate that family.

257.    Instead, the DOE has a policy pursuant to which any child who is held over must skip to the next grade if they choose to return to a public school the following year.

258.    The only exception – which is not publicized to families – is buried deep in a DOE manual called the Elementary School Policy Guide located on the DOE's website.

259.    The policy provides that if a child is required to enroll in first grade, but once the

child is registered at the school, the principal deems another grade placement would be instructionally appropriate, the principal has to consult with the superintendent. Further, the parent – and not the DOE – is required to provide medical and/or evaluative information to try to convince the superintendent that the child can change grade.

260.    However, this procedure can only be instituted if a parent is notified of the procedures, and once a child is already registered for a school. Moreover, there has to be room in the different grade and/or class for the child, as well as the appropriate IEP recommendation.

261.    Here, once L.H. held E.H. back in 2018-2019, and he repeated prekindergarten, she inadvertently put in motion a situation where E.H. could not continue his trajectory into kindergarten but would have to enroll in school.

262.    The record showed that the IEP teams preparing E.H.'s IEP were totally unaware of the DOE's policy, and they were making goals for E.H. for grades in which he would not necessarily be able to attend.

263.    The DOE does not have an appropriate and legally sound policy and procedure for how to deal with children like E.H. who need to repeat preschool due to their disabilities.

264.    This policy has systemic implications for all children like E.H. whose parents have held them over in preschool.

265.    Further, parents should not have to file for due process to effectuate another year in preschool particularly if the child is not ready for a structured academic program.

**Defendants' Use of Management Needs Section of an IEP Violates the IDEA**

266.    As noted above, a child's IEP must specify the frequency, location, and duration of the special education, related services, accommodations, modifications, supplementary aides, supports and services to be provided to a child with an IEP. 20 U.S.C. § 1414(d)(1)(A)(i)(VII).

267.    Defendants – as a matter of system-wide policy and practice – circumvent this aspect of the IDEA through the use of a catch-all section on IEPs that Defendants have entitled "management needs."

268.    In the "management needs" section of the IEP of every child recommended for ICT, the DOE places special education, related services, accommodations, modifications, supplementary aides, supports and services and does not – as a matter of policy and practice – specify frequency, duration and location.

269.    The DOE – as a matter of policy and practice – leaves all of the frequency, duration and location – of implementing all of the special education, related services, accommodations, modifications, supplementary aides, supports and services listed in management needs up to the discretion of the school to which the child will be assigned.

270.    When the IEP teams create the IEPs, they have no role in or relationship to the schools where the child will be assigned, as placement is a separate and unrelated function.

271.    This policy and procedure has been applied to every single IEP created for E.H. since 2018, and for every child recommended for ICT in New York City.

**As a Matter of Procedure, Defendants' IEP Teams Cannot Contemplate After-School Services**

272.    Under the New York State Constitution, Article XI, § 1, all children have the right to a "sound basic education" pursuant to which they must have the opportunity to obtain the skills necessary for "meaningful civic participation in contemporary society." *Campaign for Fiscal Equity, Inc. v. New York*, 100 N.Y.2d 893, 901, 905 (2003).

273.    All children in Defendant City, including those with and without disabilities, are entitled to attend a free public school on a full-time basis until the end of the year in which they turn twenty-one or earn a regular high school diploma, whichever comes first. *See* N.Y. Educ. Law

§ 3202(1); New York City Dep't of Educ., Regulation of the Chancellor A-101(I)(C)(5) (2022), *available at* https://www.schools.nyc.gov/docs/default-source/default-document-library/a101-admissions-readmissions-transfers-english.

274.     In New York, a full school year is 180 days, with a minimum of 990 instructional hours per year, or 5.5 hours per day, for students in grades seven through twelve. N.Y. Educ. L. § 3604(7); 8 N.Y.C.R.R. § 175.5(c)(3), (j).

275.     New York State has established learning standards organized into the general content areas of ELA, mathematics, science, social studies, technology, computer science and digital fluency, family and consumer sciences, world languages, the arts, health, physical education, and career development and occupational studies. 8 N.Y.C.R.R. § 100.1(t)(1).

276.     Defendants must offer students in elementary and middle school instruction that is designed to facilitate the attainment of the applicable New York State learning standards as prescribed in § 100.1(t).  8 N.Y.C.R.R. §§ 100.3(b)(1), 100.4(b)(1), (c)(1).

277.     Defendants are required to "offer students attending its schools the opportunity to meet all the requirements for and receive a Regents high school diploma." 8 N.Y.C.R.R. § 100.2(e).

278.     The IDEA provides that a FAPE means special education and related services that, *inter alia*, "meet the standards of the State educational agency" and "include an appropriate preschool, elementary school, or secondary school education in the State involved."  20 U.S.C. § 1401(9).

279.     With respect to location, the DOE's IEPs recommend either push-in services to be provided in the classroom or pull-out services to be provided in a separate location.

280.     The DOE's Standard Operating Procedures Manual states: "The location of service

delivery must be specified on the IEP. The location can be the general education classroom; the special education classroom; or a separate location, which must be specified." New York City Dep't of Educ., Special Education Standard Operating Procedures Manual 62 (Nov. 16, 2021) ("DOE SOPM"), *available at* https://infohub.nyced.org/docs/default-source/default-document-library/specialeducationstandardoperatingproceduresmanualmarch.pdf?sfvrsn=4cdb05a0_2.

281.    The IDEA provides that special education includes instruction provided in the classroom, in the home, and in other settings. 20 U.S.C. § 1401(29)(A).

282.    The United States Department of Education has recognized that students with disabilities may require services outside of the regular school day and/or outside of the regular school year in order to receive a FAPE. *See* U.S. Dep't of Educ., *Assistance to States for the Education of Children with Disabilities and Preschool Grants for Children with Disabilities; Final Rule*, 71 Fed. Reg. 46,540, 46,582 (Aug. 14, 2006); *see also* 34 C.F.R. § 300.106(a)(1), (a)(3)(ii).

283.    For example, "In general, it would be inappropriate for the IEP Team to deny children with disabilities the opportunity to participate in State mandated physical education instruction for the sole purpose of providing them with additional reading instruction. The IEP Team should consider additional strategies and scheduling, such as an extended school day or extended school year, if the child requires such instruction in order to receive a free appropriate public education." U.S. Dep't of Educ., Office of Special Educ. and Rehabilitative Servs., *Letter to Irby* 1 (Feb. 12, 2010), *available at* https://sites.ed.gov/idea/files/idea/policy/speced/guid/idea/letters/2010-1/irby021210iep1q2010.pdf.

284.    A public agency may not "[u]nilaterally limit the type, amount, or duration" of extended school year services. 34 C.F.R. § 300.106(a)(3)(ii).

285.    However, upon information and belief, absent litigation, separate location services

mandated on an IEP for a student attending a DOE public school are limited to services provided within the four corners of the school day, in a location other than the classroom.

286.    Upon information and belief, when E.H. – and students similarly situated to E.H. – are recommended for separate location services on an IEP, a public school's only option is for the school to implement those services during the student's instructional day unless (and only unless) the parent (a) files for a due process hearing; or (b) the DOE is unable to implement the services due to a staffing shortage.

287.    If the DOE is unable to implement related services recommended on an IEP due to a staffing shortage, the DOE SOPM allows the DOE to issue a voucher called a Related Service Authorization or "RSA," which allows a parent to try to locate a private related service provider from a list of providers.  DOE SOPM 97.  If the DOE is unable to implement an IEP mandate for SETSS, the DOE SOPM allows for the issuance of a similar voucher called a "P-4." *Id.* at 96.

288.    However, in situations like E.H.'s where students with IEPs or who are Section 504 eligible require separate location services (a) to receive a FAPE based on their individual needs (rather than due to a DOE staffing shortage or service unavailability), (b) to support placement in the least restrictive environment, and/or (c) to ensure equal access to the classroom instruction and academic and non-academic periods that students without disabilities are entitled to receive, the DOE will not offer a reasonable accommodation or a modification of the content or scheduling on an IEP to schedule or offer services after the regular school day.

289.    Upon information and belief, as a matter of policy, DOE staff also cannot make recommendations concerning the provision of services for a child to participate in either after-school activities or extracurricular activities or services and/or supports at a student's home on an after-school basis. Yet, the IDEA itself mandates that IEP teams consider whether children require

special education and/or related services to participate and/or take part in extracurricular activities. 34 C.F.R. § 300.107l.

# CLAIMS
## FIRST CLAIM
## THE IDEA – INDIVIDUAL CLAIMS

290.    Plaintiff repeats and re-alleges the allegations of all the above paragraphs as if fully set forth herein.

291.    Plaintiff has exhausted administrative procedures with respect to all school years at issue as required by the IDEA.

292.    The SRO Decision should be reversed with respect to all rulings and findings that are adverse to Plaintiff and to the full extent that the SRO did not grant Plaintiff's appeal.

293.    The DOE denied E.H. a FAPE in 2019 and committed procedural violations that cumulatively impeded E.H.'s right to a FAPE, significantly impeded L.H.'s opportunity to participate in the decision-making process regarding the provision of FAPE and caused the deprivation of educational benefits.

294.    The 2019 IEP was predetermined, was not supported by E.H.'s evaluations and the record evidence and was inadequate to address E.H.'s needs and support his placement in the least restrictive environment.

295.    Defendants' application of blanket policies and practices denied E.H. a FAPE and violated the IDEA.

296.    Defendants denied Plaintiff her due process rights under the IDEA.

297.    The March 2023 FOFD and SRO Decision erroneously denied Plaintiff relief for

the denial of FAPE and erroneously failed to award Plaintiff full compensatory pendency relief.

298.    The Court should reverse the SRO's rulings and findings of fact that are adverse to Plaintiff and need not afford the SRO Decision deference.

299.    Defendants failed to fully implement E.H.'s pendency as well as the final aspects of the FOFD and SRO decision.

300.    As the prevailing party, Plaintiff should be awarded payment of reasonable legal fees and costs for work performed in connection with the administrative hearing and appeals, including implementation of the awarded relief.

## SECOND CLAIM
## THE IDEA – SYSTEMIC CLAIMS

301.    Plaintiff repeats and re-alleges the allegations of all the above paragraphs as if fully set forth herein.

302.    Plaintiff has exhausted the administrative procedures for each of the school years alleged herein, as required by the IDEA.

303.    Defendants' application of blanket policies and practices repeatedly denied E.H. a FAPE and violated the IDEA.

304.    Defendants engaged in systemic predetermination by refusing to individualize E.H.'s IEPs and refusing to offer services that should be available under the IDEA.

305.    Defendants applied illegal blanket policies and practices with respect to E.H.'s evaluations and the development of E.H.'s IEPs, did not ensure that their continuum of service options for students such as E.H. included the necessary services, and did not make decisions based upon E.H.'s individual needs.

306.    Defendants' predetermination and application of blanket policies and practices repeatedly denied E.H. a FAPE and violated Plaintiff's and E.H.'s substantive, procedural, and

due process rights under the IDEA.

307.    There is no remedy through the administrative process to address the systemic claims raised here, as IHOs and SROs do not have authority to order the Defendants to refrain from applying policies and practices to E.H.

308.    Defendants have systemically failed to implement the IDEA's due process procedures.

309.    The Defendants continue the above policies and practices and continue to apply them to plaintiffs and other children.

## THIRD CLAIM
## SECTION 504 OF THE REHABILITATION ACT

310.    Plaintiff repeats and re-alleges the allegations of all the above paragraphs as if fully set forth herein.

311.    E.H. is a qualified individual with a disability entitled to protection under Section 504.

312.    Defendants receive federal financial assistance for their education programs.

313.    Defendants violated Section 504 by discriminating against E.H. based upon his disability, denying him equal access to educational services, denying him reasonable accommodations, failing to conduct a reevaluation before making a significant change in his educational program, failing to provide him with a FAPE, failing to implement IHO orders, and adopting and implementing systemic policies, procedures and practices that violate E.H.'s rights under the IDEA, Section 504, and New York State law.

314.    Defendants have treated E.H. unequally compared to students without disabilities, denied E.H. equal access to education in New York, compared to students without disabilities, and denied E.H. an opportunity to participate in educational services that are afforded to others and

that are as effective as those services offered to others.

315.    Defendants denied E.H. reasonable accommodations, including reasonable accommodations with respect to the time and location in which educational services are delivered.

316.    Defendants made a significant change in E.H.'s educational programs without fully and appropriately reevaluating him.

317.    Defendants discriminated against E.H. under Section 504 by denying him the procedural and substantive protections of the IDEA and denying him a FAPE for multiple years.

318.    Defendants violated Section 504 by failing to have adequate policies, procedures, protocols, training, and oversight concerning students with disabilities who need reasonable accommodations and the option of receiving special education and/or related services after school or outside of typical school hours.

319.    Defendants violated Section 504 by adopting policies, procedures, and practices pursuant to which IEPs are developed and special education and related services are offered based on administrative concerns and/or availability of resources, rather than students' individual needs.

320.    Defendants discriminated and are discriminating against E.H. based on his disabilities in violation of Section 504 by (a) adopting, implementing, and applying policies and practices that contravene federal and New York State law with respect to the development and implementation of IEPs, placements, programs, and accommodations for students with disabilities; and (b) failing to adopt, implement, and apply policies and practices to ensure the protection of the rights of students with disabilities under such laws.

321.    Defendants have adopted and used criteria and methods of administration in their special education programs that subjected E.H. to discrimination on the basis of his disability.

322.    Defendants' conduct was knowing, intentional, reckless, and gross.

323.    As a result of Defendants' conduct, E.H. suffered harm, and will continue to suffer harm until the harm is remedied and was denied a FAPE.

## FOURTH CLAIM
### 42 U.S.C. § 1983

324.    Plaintiff repeats and re-alleges the allegations of all the above paragraphs as if fully set forth herein.

325.    Defendants have violated 42 U.S.C. § 1983 by depriving Plaintiff and E.H., under color of state law, of their rights, privileges, and immunities under federal statutory and constitutional law.

326.    Defendants have deprived E.H. of a FAPE and denied him the educational services to which he was entitled under the IDEA, Section 504, and New York State law by (a) implementing, promulgating, and continuing to enforce and/or effectuate policies, practices, and customs or usages as alleged herein that violate the IDEA and Section 504; (b) failing to have adequate policies, procedures, and protocols to ensure that the relevant provisions of the IDEA and Section 504 were complied with; and (c) failing to supervise and train their employees and agents concerning the relevant requirements of the IDEA and Section 504.

327.    Defendants have violated 42 U.S.C. § 1983 by failing to implement the SRO decision as well as the IHO's pendency order and pendency placement.

328.    Under color of state law, Defendants denied E.H. his property interest in education and a FAPE and committed due process violations that deprived E.H. of his rights under the Fourteenth Amendment of the U.S. Constitution.

329.    As a direct and proximate result of the Defendants' misconduct, E.H. suffered harm, and continues to suffer harm until Defendants' misconduct has been remedied and their illegal policies and practices which deny E.H. his rights are terminated.

## FIFTH CLAIM
## NEW YORK STATE LAW

330.    Plaintiff repeats and re-alleges the allegations of all the above paragraphs as if fully set forth herein.

331.    The New York Education Law authorizes actions brought in State or federal court seeking review of an SRO decision. N.Y. Educ. Law § 4404(3)(a).

332.    The IDEA specifies that a FAPE must "meet the standards of the State educational agency." 20 U.S.C. § 1401(9)(B).

333.    The New York Education Law and Regulations of the Commissioner of Education are designed to implement the IDEA as required by the Act. 20 U.S.C. § 1415(a); *see* N.Y. Educ. L. §§ 4401, 4401-a, 4404, 4410; 8 N.Y.C.R.R. §§ 200.1 *et seq*.

334.    The IDEA "incorporates state substantive standards as the governing federal rule" if the state standards are "consistent with, and at least as exacting as," the Act's provisions. *Mrs. C. v. Wheaton*, 916 F.2d 69, 73 (2d Cir. 1990).

335.    Defendants denied E.H. a FAPE and denied Plaintiff her procedural due process rights in violation of New York State law.

336.    As a result of the above, Plaintiff and E.H. suffered harm, including, *inter alia*, the denial of a FAPE to E.H. and the denial of Plaintiff's procedural and due process rights.

## CONCLUSION

WHEREFORE, Plaintiff respectfully requests that the Court:

i.        Assume jurisdiction over this action;

ii.       Issue a declaratory judgment in Plaintiff's favor finding that Defendants have violated L.H.'s and E.H.'s rights as alleged herein;

iii.      Issue a preliminary and permanent injunction directing Defendants to maintain

E.H.'s pendency placement, as defined by the 2020 Pendency Order, throughout the proceedings in this action and provide E.H. with compensatory education for any pendency services that have not been provided;

iv.      Issue a final judgment and order (a) vacating and reversing the SRO Decision to the extent it is adverse to Plaintiff, (b) finding that the DOE denied E.H. a FAPE for the 2019-2020 school year, and (c) awarding Plaintiff compensatory educational services and compensatory pendency services for the 2019-2020 school year, as well as additional compensatory education for the 2020-2021 school year, as well as any appropriate additional equitable relief for the violations alleged herein; and (d) reimburse L.H. for any compensatory education and additional services she has funded while waiting for the decision in the instant case.

v.      Award compensatory damages to L.H. for the out-of-pocket costs she has incurred relative to E.H.'s education during the school years at issue in the hearing, as well as during the time pendency has been in place.

vi.      Issue a preliminary and permanent injunction directing Defendants to implement all relief awarded by the SRO, *inter alia*, providing compensatory services for any mandated pendency services not provided.

vii.      Issue a permanent injunction directing Defendants to (a) change the illegal policies and procedures alleged herein; and (b) adopt policies and procedures that comply with the IDEA, Section 504, and New York State law;

viii.      Award Plaintiff reasonable attorneys' fees and costs for the underlying due process hearing, SRO appeal, and this action; and

ix.      Award such other and further relief as the Court may deem just and proper.

Dated:          December 18, 2023
                New York, New York

                                    Respectfully submitted,

                                    THE LAW OFFICE OF ELISA HYMAN, P.C.

                                    By: _____
                                    Elisa Hyman
                                    The Law Office of Elisa Hyman, P.C.
                                    1115 Broadway, 12th Floor
                                    New York, NY 10010
                                    Phone: (646) 572-9064
                                    elisahyman@gmail.com